No. 2.—T. H. EVERETT *et al.* executors of James A. Everett, plaintiffs in error, *vs.* GEORGE W. TOWNS, defendant in error.

[1.] As a general rule, a bill for specific performance, or for what is equivalent to specific performance, will be allowed or not, according to the discretion of the Court. If, therefore, a Court dismisses a bill for specific performance, on the ground that the contract prayed to be performed is not sufficiently proved, and the proof is such as to leave it in doubt whether the contract alleged existed or not, the judgment will not be disturbed by the Supreme Court.

In Equity, in Taylor Superior Court.   Tried before Judge Crawford, April Term, 1854.

The executors of James A. Everett filed their bill against George W. Towns, alleging substantially as follows:

"That in the years of 1828 or 1829, their testator purchased of the State of Georgia, among other lots, two certain lots of land, to-wit: lots numbers 263 and 264, situated on or near the Flint river, in first district formerly Muscogee, now Taylor County, containing each two hundred two and a half acres, more or less, now of the value of four thousand dollars, or other large sum; that their testator, after said purchase from the State, and in the life time of testator, paid to the State of Georgia the whole of the purchase money agreed to be paid for said two lots of land, (and took from the State receipts for the purchase money so paid) amounting to the sum of          dollars, but that he omitted and neglected to take grants from the State to him for said lots of land, and said Everett never went into the actual possession or occupation of either of said lots of land.

That just before or soon after the death of the said Everett, who had been much afflicted, and in consequence thereof, physically incapacitated from looking after his ordinary business, one George W. Towns, on          day      , 18—, he then being the Governor of the State, did, under some pretended law or resolution of the Legislature of said State, cause said two lots of land to be advertised and sold; and he fraudulently, by himself, or through the agency of some other person or persons, purchased, or pretended to purchase the said two lots of land, and caused a grant or some other written or printed conveyance to be made and delivered to him for said two lots of land; when said Towns well knew, at the time he so purchased or pretended to purchase said lots, and at the time he caused said grant to issue, that the lots of land had been bought and paid for by their testator; and that one of complainants and others, before the said Towns bought and had said grants issued to himself, informed him of the fact; and he acknowledged that he knew or had been informed that said James A. Everett had purchased said lots and claimed them as his own.

Everett *et al.* ex'rs, *vs.* Towns.

That Towns as Governor, on or about the 24th Sept. 1850, caused to be issued to said James A. Everett, or his executors, grants to lots numbers 297, 242 and 305, in the same county and district that the said lots are situate, and which were bought and paid for at the same time that lots numbers 263 and 264 were, and which Towns well knew.

That Towns confessed that he knew before he purchased and had said grant so issued to himself, that Everett claimed said lots of land as his own, and Towns scught to purchase the same of complainants some time before he as, Governor, caused the same to be sold as the lands of the State.

That the lots numbers 263 and 264 are situate not far from the plantation of Towns, and lie between, or nearly so, of his plantation and the Flint river, and would be peculiarly valuable to him from the proximity to his lands and farm and the branch of the South Western Rail Road leading from Fort Valley to Columbus; that when the said James A. Everett so purchased said lands, which lands were sold by the Sheriff of the County of Marion, in which county said lands then lay, under an Act of the Legislature of this State passed in 1827, said Everett paid the said Sheriff the first cash payment required by said act, and took from him the certificate required, shewing said payment, and what was still due—which certificate is lost, or destroyed, or stolen from the archives of the Government —and said Sheriff, who sold said lands, soon thereafter paid to the State said first payment.

That there were only three payments more to be made, in three annual instalments, to-wit: one in 1830, one in 1831, and one in 1832; and which payments and instalments were fully paid to the State, constituting the full payment and consideration for said two lots of land, as will more fully appear by reference to the receipts of the State by the Comptroller, as follows:

COMPTROLLER GENERAL'S OFFICE, } *Georgia, Milledgeville, 24th April,* 1830. }

Received of James A. Everett, by Leroy M. Wiley, the

sum of one hundred and thirty-three dollars and ninety-four cents, for the first instalment on lots Nos. 297, 305, 242, 243, 221, 222, 263 and 264, in the first district of Muscogee.

Principal.........................................$132 85
Interest...........................................1 09

                                                 $133 94

As per certificate No. 211 of Hines Holt, Treasurer.

T. B. HOWARD, *Compt Gen'l.*

## No. 95.

COMPTROLLER GENERAL'S OFFICE, }
*Georgia, Milledgeville, 12th Jan.,* 1831. }

Received of James A. Everett, by Peter B. Greene, Esq., the sum of ninety dollars and thirty-five cents, the second instalment for lots Nos. 242, 243, 263, 264, 297 and 305, all in the first district of Muscogee County, as per certificate No. 95 of Hines Holt, Esq., Treasurer.

T. B. HOWARD, *Compt. Gen'l.*

## No. 145.

COMPTROLLER GENERAL'S OFFICE, }
*Georgia, Milledgeville,* 20th *Jan.,* 1832. }

Received of James A. Everett, by Peter B. Green, Esq., the sum of eighty-nine dollars and thirty-six cents, the third instalment for lots Nos. 242, 243, and 263, 264, 297 and 305, all in the first district of Muscogee County—$89$\frac{36}{100}$, as per certificate No. 145 of John Williams, Esq., Treasurer.

T. B. HOWARD, *Comp Gen'l.*

That these grants to Towns were obtained thus, fraudulently, and were consequently void.

The prayer was that they might be delivered up to be cancelled.

George W. Towns answered the bill in substance as follows:

He knows nothing of the alleged purchase of the two lots of land, to-wit: numbers 263 and 264 in the first district of origin-

ally Muscogee, now Taylor County, by James A. Everett in his life time, and from all he has been informed in reference to the same, he does not believe that Everett ever did purchase the same from the State of Georgia. He admits that the two lots of land are worth four thousand dollars.

He has no knowledge of Everett, in his life time, having purchased said land, and of his having paid to the State of Georgia the purchase money agreed to be paid for the same; and his information derived from Everett himself, in his life time, was, that Everett was not a purchaser of the same; and his information as to Everett having paid the purchase money for said land to the State, from an examination of the proper records and offices at the seat of Government, was and is, that Everett never paid the purchase money, or any part of it, to the State for said two lots of land, in performance of any contract made by him with the State; and he does not believe that Everett ever did make a contract with the State for the purchase of the same, or ever paid any money to the State in performance of any contract for the purchase of the same.

He admits that grants from the State never issued to Everett, and he believes they never ought to have issued to him; and that Everett never entered into the possession of the same.

To the statement, that at the time Everett purchased said lands, he paid to said commissioners one fifth of the purchase money required to be paid, and took from them, in writing, signed by them according to the requirements of the law, certificates that he had so purchased said lots of land and paid the part required to be paid, he has no knowledge of the facts, or either of them, and does not believe that Everett ever paid the fifth part of the alleged purchase money to the commissioners; and does not believe the commissioners ever issued to Everett any certificate, in writing or otherwise, that he had so purchased the lands, and paid the part required by the law;

He does not believe the same is in any of the departments of the State Government; nor does he believe the same ever was in existence.

He knows nothing of Everett having paid to the State of Ga. the whole amount of the purchase money for said lands. He knows nothing of the payments charged to have been made on the 24th April, 1830, 12th January, 1831, and 20th April, 1832; he knows nothing of the alleged payment of the fourth instalment charged to have been made in the year 1833, and of a receipt being taken for it; but believes that such payment was never made by Everett, nor a receipt given for the same; and does not believe that such receipt was ever lost or mislaid, either by Everett or complainants.

He admits that on the 21st day of December, 1848, he then being Governor of said State, he caused a list of the ungranted fractional lots and undrawn lots of land, as reported to him by the Surveyor General of the State, lying in the county of Macon, to be sent to the Sheriff of the county as provided for and directed by Act of the Legislature approved December 30, 1847; and after the same was duly advertised, said two lots of land, numbers 263 and 264, among others, were sold by the Sheriff under the provisions of the Act of the Legislature, on the first Tuesday in February, 1849.

Henry J. G. Williams, at the sale aforesaid, became the purchaser of lot number 263, at the price or sum of $405 00, and Benjamin F. Gullett became the purchaser of lot number 264 at the price or sum of $550 00; and Williams and Gullett then obtained certificates of the sale of said two lots as required by law, and which certificate to said Gullett was afterwards, to-wit: on the 1st day of March, 1849, duly transferred to defendant; and on the same day Williams transferred the certificate of sale issued to him to defendant.

He admits before the sale of said land, he assured Gullett and Williams that if the two lots should be disposed of at a less sum than fifteen hundred dollars, that they would be authorized to buy them, and he would take and pay for them.

That all and singular the statements contained in said Bill, that defendant fraudulently, by himself or other person, purchased said lands are false and untrue, and on the contrary, the conduct of the complainants, or at best, that of one of them,

to-wit: Adolphus D. Kendrick, at the sale of said lands, as he has been informed and believes, was such as to induce Gullett and Williams to believe that complainants have no right or interest in or to said two lots of land, or either of them.    For he states as matter of information and belief, that Kendrick was present at the sale, and gave no notice of any claim or title to said two lots of land in said James A. Everett in his life time, and made no objection to the sale, although at that time one Thurston R. Bloom publicly objected to the sale of said two lots, on the ground that he and one Johnson had applied at the proper department of the State Government to grant the same, and that therefore Bloom and Johnson were entitled to the same. Wherefore, defendant says and insists, that the facts herein stated show that complainants have been and are now acting fraudulently in endeavoring to set up a title which they concealed from the public at the time defendant acquired his title to the lands.

The charge in the bill that he fraudulently caused grants or other evidence of title to be issued to himself, is wholly false and untrue.  Upon the very first intimation of claim to said land by complainants, defendant suspended all further proceedings as to issuing grants and afterwards, at the next session of the General Assembly of said State, the facts in relation to the lands were submitted to the General Assembly in a memorial of defendant, in which he offered to issue the grants to such persons as the General Assembly might direct; and after consideration of the same and the claim of complainants, the Gen. Assembly, by a resolution passed on the 29th day of December, 1849, decided that the grants to said two lots of land should issue to defendant.

The grants did not issue until the 26th day of February, 1851, and in the mean time the two last instalments on said lands, amounting in the aggregate to the sum of $642\frac{26}{100}$, were paid by defendant, and yet no steps were taken or any thing done by said complainants, to prevent the issuing of said grants. Wherefore, defendant declares that his act in issuing the grants was not fraudulent, but that the same was fairly and *bona fide*

issued to him in the day and year aforesaid, in accordance with the Act of the General Assembly of 1847, and the resolution of the same as above mentioned.

He utterly and fully denies that he had any notice that Everett had bought or claimed said lands, or either of them, at the time he purchased them. So far from having any such notice, he says that some time in the year 1845, or thereabouts, he applied to some persons residing in the neighborhood of these lands, and especially to Caleb Lisberg, who owned a lot adjoining lot number 263, who were the owners of these lands? and could get no information concerning the owner or owners; and being desirous to purchase lots numbers 268, 263, 264, 279 and 280, and being advised that Everett was the owner of lot number 279, he applied in person to Everett to purchase such of them as he owned, and did purchase from him lots numbers 279 and 280, and at the same time inquired especially if he was the owner of lots numbers 263, 264 and 268, or if he knew who did own them. Everett replied distinctly that he did not own them, or either of them, and did not know who did own them; and afterwards defendant applied to the proper department of the State Government to ascertain who were the owners of lots numbers 263 and 264, and was informed that said last mentioned lots had never been disposed of by the State.

Defendant most positively denies that either of the complainants, or any other person, gave him notice that Everett had bought or claimed said tracts before defendant bought them; and he denies most positively that he ever acknowledged that he knew or had been informed that Everett had bought or claimed said lands before defendant bought them. The first thing he knew of complainants claiming said land was in the fall of the year 1849, when he was informed that the Check Book in the Treasury at Milledgeville showed that Everett had at different times made three payments at the Treasury on and for sundry lots of land; but defendant denies that the certificates found in said Check Book, and which are mentioned in the bill, furnished any notice to him that any specific sum had

been paid for those particular lots, or that they furnished any notice that the same was paid in pursuance of any contract between Everett and the State for the sale and purchase of said two lots of land.

He does not know or remember what grants were issued to Everett, or his executors, on the 24th of September, 1850, or whether any were issued to the lots in said bill mentioned, that is, lots numbers 297, 242 and 305, but states that said Kendrick, one of the complainants, did purchase lot number 242 at the price of $460, and number 243 at the price of $351, (both of which lots are mentioned in the certificates to said amended bill mentioned,) at the same sale that numbers 263 and 264 were bought by said Gullett and Williams.

He most positively denies that he ever confessed, before he purchased said lands, that he knew Everett claimed them; and he also denies that he ever, at any time, sought to purchase the same from complainants, or either of them, and says that all such allegations in complainants' Bill are false and untrue.

That George W. Towns is entitled to grants for fractional lot No. 267 and lots of land Nos. 263 and 264, in the first district of originally Muscogee, now Macon County, under the terms and conditions of the sale at which he became the purchaser of the same, under an Executive order pursuant to an act of the last General Assembly of this State.

On the trial, Wiley Williams, Esq. was introduced by complainants, who swore that he was present at the sale of undrawn square lots of land lying in that part of the County of Muscogee, then Marion. The sale was in 1829. The lands in dispute lie in that section. The sale was made by the Sheriff, in pursuance of the Act of the Legislature. The Surveyor General furnished the Sheriff with a list of the lots which were said to be undrawn lots. Does not recollect any of the numbers, nor that the list furnished by the Surveyor General were all the undrawn lots.

The Sheriff gave certificates to the purchasers of the lots, sold on the payment of the first payment due, and thinks all

were sold that were in the list furnished the Sheriff. Witness wrote the certificates in blank, and the Sheriff filled them, and gave them to the purchasers; but who were any of the purchasers he does not recollect, it has been so long. He does recollect that the Sheriff did make his return and settlement for said sales, and payment of the moneys received, at the Treasurer's office, or that witness did it for him. He is certain that he was present when the money was paid to the Treasurer of the State, but he cannot recollect the amount paid, nor for what particular lots.

To the best of his recollection, James A. Everett was not at the sale. He does not remember any one of the purchasers on that occasion. Mr. Everett might have had an agent there to bid, and he not remember it. He thinks Mr. Green was there, but whether he bid for Everett he does not remember.

The defendant's Counsel then presented the receipts before referred to, to the witness, and asked him if the signatures thereto were the hand-writing of Howard, the Comptroller General? He answered that he was acquainted with Mr. Howard's hand-writing, having often seen him write, and that the two last receipts, dated in 1831 and 1832, he had no doubt bore the true and proper signature of T. B. Howard, the Comptroller: but that he did not think the signature to the first, dated in 1830, was in the hand-writing of Howard.

On being crossed by complainant's Solicitors, he said it might be his signature; that men did not always write the same: nor could he say that the signature was not put there by a clerk, and by the direction of Howard.

Here complainants announced that they closed, when defendant's Solicitors demurred to the evidence, and moved to dismiss the bill, on the ground that complainants had not, by their proof, made such a case as entitles them to a decree in said cause—

1st. Because complainants had not given in evidence the will of their testator, to prove they were entitled to recover said lands, or to the relief they asked.

2d. Because they had given no evidence of any contract of purchase of said lands by Everett from the State.

3d. Because they had given no evidence that Towns had notice of any contract of purchase from the State by Everett, before he (Towns) purchased from the State.

On hearing argument, the Court sustained the motion to dismiss on the two last grounds, without deciding the first, and the bill was accordingly dismissed.

This decision is the error assigned.

HUNTER & SCARBOROUGH, for plaintiff in error.

L. B. SMITH and B. HILL, for defendant in error.

*By the Court.*—BENNING, J. delivering the opinion.

[1.] This bill is like a bill for specific performance. It is true the prayer of it is not that the State may perform its contract and make a conveyance of the legal title to the complainants, but it is that the Court may, itself, do what shall serve in place of such a conveyance. The prayer is that the conveyance made by the State to Towns may be cancelled, "and that it may be decreed that the legal title to said lots of land is in the estate of orator's testator." The decree of the Court shall serve for a conveyance—this is the prayer. And the prayer is made to take this extraordinary form, perhaps, from the difficulty which the complainants felt to lie in the way of the ordinary form of bill and prayer in such cases. The ordinary form requires the person who ought to make the conveyance to be a party to the bill, and also requires him to be decreed to make the conveyance. But in this case, the State is that party, and the State cannot be sued; and if it could be, a judgment against it, rendered by a Court, one of its own creatures, could not be enforced. Hence, perhaps, the form of prayer, and the form of bill in this case—a form which omits from the

bill the party that is the *indispensable* one in ordinary cases of this sort—the party that is, perhaps, the only one that is to be the ultimate loser or gainer by the event of the suit.

For such a bill I know not of any precedent. And in my opinion, for such a one there is no law.

If, however, there is for such a bill any law, it must be the law of specific performance—the law applicable to the specific performance of contracts.

One of the parts of that law is thus stated by Judge *Story* in his Commentaries on Equity Jurisprudence: "In truth the exercise of this whole branch of Equity Jurisprudence, respecting the rescission and specific performance of contracts, is not a matter of right in either party, but it is a matter of discretion in the Court—not, indeed, of arbitrary or capricious discretion, dependent upon the mere pleasure of the Judge, but of that sound and reasonable discretion which governs itself as far as it may, by general rules and principles." And this statement of the law is well supported by the authorities which he cited. (2 *Story Eq.* §742.)

It is not a matter of right, then, in either party to have a specific performance decreed. The Court may decree one or not, according to the facts and its discretion.

The judgment assigned for error in this case was that which, on the motion of the defendant, dismissed the bill. This judgment the Court put upon two of the three specifications of the ground taken in the motion to dismiss—these two—that the complainants had given no evidence of any contract of purchase by Everett from the State—that they had given no evidence showing Towns to have had notice of any contract of purchase by Everett from the State, before he, Towns, purchased from the State.

What evidence did the complainants give on these points?

On the first, they gave three receipts from the Comptroller General, dated respectively in 1830, 1831, 1832, acknowledging the receipt from Everett of three instalments for several lots of land, and among them the two lots in dispute in this

case.   This is all the receipts specify, and this is all the evidence the complainants gave of the contract of purchase.

Now it is true that it is difficult to account for the existence of these receipts, except upon the hypothesis that Everett had, by *some* contract, purchased these two lots from the State. But, then, it is equally true that there are in the case some other things which it is as difficult to account for, on the hypothesis that he did purchase the lots, at least by any such contract of purchase as the law allowed of.   If he purchased the lots, why did not the complainants show the certificate of such purchase, given to him at the time of purchase by the Sheriff, who, as the State's agent, sold him the lots?   Why did they not show the return of the Sheriff to the State Treasury, which, if he, Everett, had been such purchaser, would have contained a statement of that fact?   If Everett purchased under any law authorizing him to purchase, it is to be presumed that the certificates and the return both exist—the certificates in the possession of the complainants themselves—the return in the possession of the Treasurer of the State, and so within their reach for evidence—for the only law existing to authorize him to purchase the lots—that is, to authorize any sale of the lots, is a law which requires the Sheriffs, whose duty it is made to sell such lots, to give to the purchasers certificates "stating the amount paid, and the amount of such purchase money then due and to be paid, in three equal annual instalments to the Treasurer of this State," and "within sixty days after the sales of said lots," "to make a report of their proceedings to the Treasury," "pay over to him the money received, and deposit a schedule of the lots sold, the amount of sales, cash received, balance due for each lot and from whom due." (*Daw. Com.* 270, 266.)   And it is to be presumed, until the contrary be shown, that the Sheriff who sold this lot to Everett, if one did sell it to him, did his duty, and so gave Everett a certificate of purchase, and made a report of that fact to the Treasurer. Besides, Wiley Williams testifies that the Sheriff, who, if any, must have been the one to sell these two lots, if they were sold according to law and at the time when it is alleged in the bill

they were sold, viz : in 1828 or 1829, did give certificates for all the lots which he sold, and did make a report of his sales, &c. to the Treasurer. Williams testifies that he himself wrote the certificates in blank, and that the Sheriff filled them and gave them to the purchasers. He says, the Sheriff made his return and settlement for the sales at the Treasurer's office, or that he did it for the Sheriff.

Here, then, is matter from which a strong presumption is to be made, that if Everett purchased the lots, he had a certificate of such purchase, and also written evidence of the purchase in the Sheriff's return to the Treasury.

If, then, Everett was the purchaser of the lots, why did the complainants not show these certificates, or show some reason for not doing that? Why did they not show the return of the Sheriff, with the statement in it that he, Everett, was the purchaser? Why they did not do these things is difficult to account for, if we suppose Everett to have been, as alleged in the bill, the purchaser of the lots.

But this is not the only difficulty. How could Everett have purchased, if he was not at the place of sale, and Williams, the witness, says that to the best of his recollection, Everett was not there? The complainants offer no proof that he had an agent there.

And this is not all: Everett, in his life time, in 1845, told Towns that he did not own these lots, and that he knew not who did.

But this statement of Everett is derived from the answer of Towns, and is a statement which, according to the argument of the plaintiffs in error, is not responsive to any allegation in the bill. In that, however, they are mistaken. The bill alleges that Everett "*purchased* of the State of Georgia" the two lots. It alleges that Towns *knew* that "the lots had been bought and paid for by" Everett. A statement of what Everett, himself, said with respect to his title, would be responsive to either of these allegations.

The result is that there are things in the case which it is as hard to account for, on the supposition that Everett did pur-

Everett *et al.* ex'rs, *vs.* Towns.

chase the lots, as it is to account for the Treasury receipts on the supposition that he did not purchase the lots. And that is but saying that the evidence on one side of the case balances the evidence on the other.

In such a case, the discretion of the Court to refuse a specific performance, or what is equivalent to one, and dismiss the bill, ought not to be disturbed. In every such case, the complainants ought, at least, to show a preponderance of evidence in favor of the contract on which they insist.

But in this case the preponderance is, if any thing, the other way, for in addition to what has already been stated as being adverse to the idea that Everett purchased the lots, there are the following circumstances : Everett never took possession of the land—never took out grants for it—never, as far as appears, claimed title to it, although he had almost twenty years within which to do any or all of these things, according to the statements in the bill; for, according to those statements, he purchased in 1828 or 1829. And his executors, the plaintiffs in error, did not commence this suit until 1852; until after all of the purchase money had been paid the State for the land as sold a second time—if it had ever been sold a first time.

Indeed, taking the bill to be true, the complainants need no help from Equity. Their *legal* title, they say, is complete. They say the legal title vested in Everett, at the time when he paid the purchase money to the State. If so, what use is there for this bill ? None.

And I may say for myself, that I know of nothing that gives to a Court of Equity the *power* to grant the prayer of this bill. Whence did a Court of Equity get the power to nullify an act of one of the departments of Government. If it can nullify a grant made by the Executive Department, why may it not equally nullify a commission issued by that department—a military order made by that department—in a word, any act of that department? If it can do things of this sort, it must be by virtue of some grant of power to it in the Constitution, or in the law. I know of no such grant. Such a power English Courts of Equity do not pretend to have.

It is, however, the opinion of the whole Court that the Court below was justified in dismissing the bill on one of the grounds on which the decision was put, viz: that which has been considered—the ground that the contract of purchase was not sufficiently proved.

So the judgment ought to be affirmed. And it becomes unnecessary to notice the other ground on which the Court placed its judgment.